# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-CR-00233 (ABJ)** |
| **v.** | : | |
| | : | |
| **KEVIN M. CRONIN II,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Kevin M. Cronin II to 60 days' incarceration, a three-year term of probation, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Kevin M. Cronin II, a 30-year old former Army National Guardsman, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Cronin pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 60 days'

---

[1] Although the Statement of Offense in this matter, filed on October 21, 2022, (ECF No. 45 at ¶ 6) reflects a sum of more than $2.7 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol were $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

incarceration is appropriate in this case because Cronin: (1) was near the front of the barricade line on the Upper West Plaza and Lower West Terrace where he was confronted by police officers, witnessed violence between other rioters and police officers, including various assaults, deployment of tear gas, chemical spray, and fire extinguishers, and the detonation of a flashbang, and heard dispersal orders being projected by police through a loudspeaker, but nonetheless joined a mob of hundreds who advanced forward to enter the Capitol building; (2) entered the Capitol building through the Senate Wing Door less than one minute after that door was first breached—a breach that was accomplished with the assistance of his brother—making him fully aware of the potential for violence and property destruction; (3) traveled further into the Capitol to the Northwest Entry Corridor, where he turned around and returned to the Senate Wing Door, smoked a cigarette inside the Capitol building, and exited; (4) entered the Capitol building for a second time with his brother, traveled even further into the Capitol to the Crypt, the Memorial Door, Statuary Hall, and to a connector hallway leading to the House Chamber, where he turned around, returned by the same path, and exited the building; and (5) entered the Capitol building for a third time, and traveled to the Crypt where he was turned back by police officers and exited.

The Court must also consider that Cronin's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts of and circumstances of Cronin's crime support a sentence of 60 days' incarceration.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 45 (Statement of Offense), at ¶¶ 1-7.

*Cronin's Role in the January 6, 2021 Attack on the Capitol*

Defendant Kevin M. Cronin II (Cronin), who lives in Puyallup, Washington, traveled to Washington, D.C. with two codefendants, his father Kevin M. Cronin Sr. (Cronin Sr.)[2] and brother Dylan R. Cronin (Dylan), to attend the "Stop the Steal" rally on January 6, 2021.[3] As shown in Image 1, Cronin attended the rally wearing what appears to be a black jacket and red hat with stitched white lettering, "Make America Great Again," and stitched yellow leaves on the brim. Cronin Sr. was wearing a green jacket and red hat with stitched white lettering, "TRUMP 2020." Dylan was wearing a green military-style plate carrier, black long sleeve shirt, black gloves, black pants, and red hat with stitched white lettering, "Make America Great Again." In other images, Cronin, Cronin Sr., and Dylan are shown using various face coverings throughout the day.

---

[2] Government's Sentencing Memorandum for Cronin Sr., the father of the defendant, is attached as "Exhibit 1," and contains additional images relevant to Cronin's conduct on January 6.

[3] On January 6, 2023, Cronin Sr. pled guilty to one count of violating 40 U.S.C.  § 5104(e)(2)(G), and Cronin Sr. was sentenced by the Court on April 12, 2023, 18 months' probation, 100 hours of community service as a condition of probation, a $1,500 fine, and $500 restitution. On February 24, 2023, Dylan pled guilty to one count of violating 18 U.S.C. § 1752(a)(1) and one count of violating 18 U.S.C.  § 1361. Dylan will be sentenced on June 23, 2023.

3



*Image 1, a still from Exhibit 2, Timecode 0:35 – Cronin Sr., Dylan, and Cronin (left to right)*
*in Washington, D.C. on January 6*

After the rally, between approximately 12:00 and 1:00 p.m., Cronin, Cronin Sr., and Dylan marched to the Capitol. By approximately 2:00 p.m., the three made their way up the West Front of the Capitol grounds to the Upper West Plaza. As shown in Images 2, 3, 4, and 5, they were near the front of the barricade line. There, they observed violence between rioters and police officers, including the deployment of tear gas, chemical irritant sprays, and fire extinguishers, as well as a flashbang detonation.



*Image 2, a still from Exhibit 3, Timecode 1:36 – Cronin and Dylan (left to right) at Upper West Plaza*



*Image 3, a still from Exhibit 4, Timecode 9:06 – Cronin at Upper West Plaza, immediately prior to flashbang detonation*



*Image 4, a still from Exhibit 5, Timecode 1:36 – Cronin (wearing face covering)
at Upper West Plaza*



*Image 5, a still from Exhibit 6, Timecode 8:17 – Cronin and Dylan (left to right)
at Upper West Plaza*

On the Lower West Terrace, a short distance from where Cronin, Cronin Sr., and Dylan
were standing, the Metropolitan Police Department ("MPD") played a dispersal order telling all
people to leave the area, which can be heard in Exhibit 3, Timecode 1:15. Approximately every
30 seconds, a loudspeaker announced: "This area is now a restricted access area pursuant to D.C.
Official Code 22-1307(b). All people must leave the area immediately. This order may subject you

to arrest and may subject you to the use of a riot control agent or impact weapon." Cronin, Cronin Sr., and Dylan ignored the dispersal order and advanced toward the Capitol building.

At approximately 2:10 p.m., the three men ascended the Northwest Staircase to the Upper West Terrace. By approximately 2:11 p.m., a group of rioters, including Cronin and Dylan, made their way across the Upper West Terrace and Northwest Courtyard to the Senate Wing Door of the Capitol building. As shown in Exhibit 4, Timecode 11:00 through 13:00, several rioters—including Dylan—kicked the Senate Wing Door from the outside and smashed glass windows adjacent to the door in an attempt to gain entry to Capitol building.

At approximately 2:13 p.m., as shown in Exhibit 7, the Capitol building was first breached by a rioter who jumped through a window adjacent to the Senate Wing Door, which had been broken by Dylan and others. Less than one minute later, rioters who had entered through broken windows kicked open the Senate Wing Door from the inside. Many rioters who had amassed outside the Senate Wing Door, including Cronin, then entered the building.

As shown in Images 6 and 7, at approximately 2:13 p.m., Cronin entered the Capitol building through the breached Senate Wing Door and he was reunited with Dylan.



*Image 6, a still from Exhibit 4, Timecode 12:47. – Cronin enters Capitol building*



*Image 7, a still from Exhibit 7, 2:13 p.m. – Cronin and Dylan (left to right)
reunited inside Capitol building*

As shown in Images 8, 9, and 10, Cronin and Dylan remained near the Senate Wing Door
and looked for Cronin Sr., who had been behind them. As shown in Image 8, during that time,
Dylan picked up a piece of lumber from the ground.



*Image 8, a still from Exhibit 7, 2:13 p.m. – Cronin (left) looking outside for Cronin Sr.,
and Dylan (right) picking up a piece of lumber*



*Image 9, a still from Exhibit 7, 2:14 p.m. – Cronin Sr. (left) entering Capitol building, Cronin (center) looking outside for Cronin Sr., and Dylan (right) holding a piece of lumber*



*Image 10 – Cronin looking outside for Cronin Sr.*

At approximately 2:14 p.m., Cronin and Dylan were reunited with Cronin Sr., as shown in Image 11.



*Image 11, a still from Exhibit 7, 2:14 p.m. – Cronin Sr., Cronin, and Dylan (left to right) reunited inside Capitol building, and Dylan holding a piece of lumber*

Cronin, Cronin Sr., and Dylan turned north and traveled through the Northwest Entry Corridor towards the Senate side of the Capitol building. They then travelled back by the route they had entered to the Senate Wing Door foyer, where they arrived at approximately 2:18 p.m. There, Cronin and Cronin Sr. smoked cigarettes inside the Capitol building, as shown in Image 12.



*Image 12, a still from Exhibit 7, 2:19 p.m. – Cronin smoking a cigarette*

At approximately 2:21 p.m., Cronin, Cronin Sr., and Dylan exited the Capitol building through the Senate Wing Door. At approximately 2:24 p.m., Cronin and Dylan re-entered the Capitol building through the Senate Wing Door, as shown in Image 13.



*Image 13, a still from Exhibit 7, 2:24 p.m. – Cronin and Dylan (left to right) re-entering Capitol building*

At approximately 2:26 p.m., they traveled to the Crypt, as shown in Image 14.



*Image 14, a still from Exhibit 8, 2:26 p.m. – Dylan and Cronin (left to right) in Crypt*

At approximately 2:30 p.m., Cronin and Kevin traveled to the Memorial Door and the Memorial Stair leading to Statuary Hall, as shown in Images 15 and 16, respectively.



*Image 15, a still from Exhibit 9, 2:30 p.m. – Cronin and Dylan (left to right) near Memorial Door*



*Image 16 – Cronin at the top of Memorial Stair*

At approximately 2:32 p.m., Cronin and Dylan paraded through Statuary Hall, as shown in Image 17.



*Image 17, a still from Exhibit 10, 2:32 p.m. – Cronin and Dylan (left to right)
crossing through Statuary Hall*

By approximately 2:34 p.m., Cronin and Dylan made it together to a connector hallway

between Statuary Hall and the House Chamber, as shown in Images 18 and 19.



*Image 18 – Cronin entering Statuary Hall Connector hallway*

13



*Image 19, a still from Exhibit 11, 2:34 p.m. – Cronin and Dylan (left to right)*
*in Statuary Hall Connector hallway*

At approximately 2:35 p.m., Cronin turned around and travelled back by himself, taking the route that he had entered.

Cronin exited the building through a broken window adjacent to the Senate Wing Door at approximately 2:38 p.m., as shown in Image 20.



*Image 20, a still from Exhibit 12, Timecode 00:27 – Cronin exiting Capitol building*
*through a broken window*

14

At approximately 2:40 p.m., Cronin was in the Northwest Courtyard, as shown in Image 21. Subsequently, Cronin and Cronin Sr. were reunited at that location.



*Image 21, a still from Exhibit 13, 2:40 p.m. – Cronin near Northwest Courtyard*

At approximately 2:42 p.m., Dylan traveled by himself to the Upper House Door. There, at approximately 2:47 p.m., he exited the Capitol building to the top of the House Steps. At approximately 2:48 p.m., Dylan re-entered the building through the Upper House Door and remained in the foyer area of that door until approximately 2:57 p.m., when he and other rioters were physically forced out of the building by police officers. By approximately 3:43 p.m., Dylan had traveled to the Central East Steps of the Capitol grounds.

At approximately 2:47 p.m., the Senate Wing Door was breached on a second occasion by rioters, as shown in Image 22.



*Image 22, a still from Exhibit 14, Timecode 00:14 – Second breach of Senate Wing Door*

At approximately, 2:52 p.m., Cronin re-entered the Capitol building through the breached

Senate Wing Door, as shown in Image 23.[4]



*Image 23, a still from Exhibit 14, Timecode 05:01 – Cronin entering Capitol building*
*through Senate Wing Door*

---

[4] Cronin's third entry into the Capitol building was first disclosed to agents during Cronin's debrief session on March 20, 2023, as further detailed below. Before that, the government believed Cronin entered the building only twice. The government has since corroborated Cronin's account of a third entry through closed-circuit video and open-source evidence.

At approximately 3:02 p.m., Cronin entered the Crypt for a second time, as shown in Image 24. There, Cronin was turned back by police officers, so he travelled back by the route he had entered.



*Image 24, a still from Exhibit 15, Timecode 10:15 – Cronin in the Crypt*

By approximately 3:07 p.m., Cronin returned to the Senate Wing Door foyer, as shown in Image 25.



*Image 25, a still from Exhibit 16, Timecode 15:41 – Cronin near the Senate Wing Door*

Cronin exited the Capitol building through the Senate Wing Door, as shown in Image 26, and he did not re-enter.



*Image 26, a still from Exhibit 17, Timecode 02:22 – Cronin exiting the Capitol building through the Senate Wing Door*

By approximately 4:29 p.m., Cronin, Cronin Sr., and Dylan were reunited on the Lower West Terrace near scaffolding that had been erected for the inaugural ceremony.

*Cronin Deployed to Washington, D.C. with WANG on January 14*

On January 14, 2021, less than one week after Cronin participated in the January 6 attack on the Capitol, 49 members of the Washington Army National Guard (WANG), including Cronin, deployed to Washington, D.C. in support of the Presidential Inauguration. WANG members, including Cronin, were housed in Arlington, Virginia for the entire deployment and did not enter the District of Columbia. Cronin was part of a reaction team, which remained on standby for the duration of the deployment but was never sent out on any missions. WANG members, including Cronin, returned to Washington state on January 24, 2021. When interviewed, Cronin's WANG superior officer was not aware of any personal travel taken by Cronin to Washington, D.C. on January 6.

*Cronin's Interview*

On March 20, 2023, Cronin participated in a debrief with FBI agents pursuant to the terms of his plea agreement. Cronin's account was largely corroborative of agents' investigative findings. Cronin told agents that he, Cronin Sr., and Dylan decided to attend former President Trump's speech in Washington, D.C. On January 6, Cronin, Cronin Sr., and Dylan walked to the Washington Monument. They tried to get into the rally at the Ellipse but were denied entry. Instead, they watched the speech on a large screen outside the venue. After the speech, they marched with the crowd towards the Capitol. Cronin could not recall the exact route they took to arrive at the grounds, but he did remember being near the Lower West Terrace. Cronin described events there as "happening fast" and, at one point, he recalled being hit in the leg by an unknown object. Cronin observed the police employing crowd control measures, including tear gas. Cronin advised that he previously assisted in crowd control while assigned to WANG, and he wanted to make sure no one got hurt and people kept their cool. Cronin claimed to have aided a man who was suffering from the effects of tear gas exposure by pouring water into the man's eyes.

Cronin heard someone yelling, "Come on!," from the steps of the scaffolding, and he followed the crowd to the Senate Wing Door. Cronin claimed he did not remember seeing Dylan kicking the Senate Wing Door or breaking a window. Once Cronin entered the Capitol building, he found Dylan and started looking for Cronin Sr. They were all reunited near the Senate Wing Door. Cronin falsely claimed that he went inside for safety from the munitions being fired outside and because the crowd was pushing people into the building, in spite of the fact that he entered the building multiple times of his own accord and stayed on the grounds until dark. Cronin advised that there were alarms going off when he entered the building, but later in the debrief, he

equivocated and said he did not recall hearing alarms. Cronin claimed that he smoked a cigarette inside the building because of stress.

Eventually, Cronin believed it was time to leave, so he and Dylan escorted Cronin Sr. outside. Cronin told agents that he wanted to stay together, but Dylan wanted to go back inside to record the events on his cell phone. Cronin dubiously claimed that he entered the Capitol on a second occasion because Cronin Sr. wanted him to follow Dylan and bring him out. Cronin told agents that he located Dylan near the House side of the building but could not convince Dylan to leave. Cronin then backtracked to the Senate Wing Door and exited through a broken window at the direction of police officers. Cronin reunited with Cronin Sr. once outside.

Cronin and Cronin Sr. tried to call Dylan multiple times but could not reach him. Cronin advised agents that he entered the Capitol building for a third time to find Dylan. Cronin made it to the Crypt where he encountered police officers who waved him out of the building. Cronin turned around and exited the building at the Senate Wing Door. After finding Cronin Sr. outside, Cronin was able to reach Dylan by phone. Cronin and Cronin Sr. walked to the other side of the Capitol and met Dylan. Once reunited, they returned to the Lower West Terrace. Dylan wanted to stay to record the events on his cell phone. Cronin recalled an individual with a megaphone reading what President Trump had tweeted. The Cronins left the Capitol grounds once it started to get dark.

Cronin told agents that on January 7, he, Cronin Sr., and Dylan spent the day sightseeing at the National Mall. They discussed the events of the prior day but did not go back to area of the Capitol. On January 8, all three flew back together to Seattle.

*The Charges and Plea Agreement*

On June 9, 2022, Cronin was charged by Amended Complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 13, 2022, Cronin, Cronin

20

Sr., and Dylan were arrested in Puyallup, Washington. On July 5, 2022, Cronin was charged by Information with the same offenses. On January 19, 2023, Cronin pleaded guilty to Count Six of the Information charging a violation of 40 U.S.C. § 5104(e)(2)(G). Under the plea agreement, Cronin agreed to pay $500 in restitution to the Department of the Treasury.

### III.     Statutory Penalties

Cronin now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement, he faces up to six months of imprisonment and a fine of up to $5,000.[5] The defendant must also pay $500 in restitution under the terms of the plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, all of the Section 3553(a) factors weigh in favor of the recommended sentence of 60 days' incarceration, three years' probation, 60 hours of community service, and $500 in restitution.

#### A.     The Nature and Circumstances of the Offense

"The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States*

---

[5] Because Cronin has pleaded guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

*v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Cronin's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Cronin, the absence of violent or destructive acts is not a mitigating factor. Had Cronin engaged in such conduct, he would have faced additional criminal charges.

Cronin arrived on the grounds of the U.S. Capitol and entered the Capitol building at approximately 2:14 p.m. In order to gain entry to the Capitol at that time, he would have crossed over broken down barricades and passed by bike racks that were intended to prohibit entry into the restricted area of the Capitol's grounds. Prior to entering the Capitol building, Cronin observed rioters fighting police officers, the deployment of tear gas, chemical irritant sprays, fire extinguishers, and the detonation of a flash bang. Cronin was within earshot of a dispersal order that was being repeatedly projected at a high volume from a loudspeaker by MPD officers. On the West Front of the Capitol at that time, Cronin would have witnessed individuals climbing on scaffolding, on the media tower, and other structures that had been erected for the inauguration. It would have been clear to Cronin that police lines had been penetrated and that rioters had caused property damage. Despite these circumstances, Cronin stayed.

Together with his father and brother, Cronin joined a crowd that advanced toward the Capitol building and made entry through a non-public entrance at the Senate Wing Door less than one minute after the Capitol was first breached by his own brother, Dylan, and others. Thus, Cronin took advantage of the opportunity presented by the mob, ignored the violence and property damage taking place, and unlawfully entered the Capitol building, not once, but three separate times.

All told, Cronin was inside the Capitol for approximately 36 minutes, despite the evidence of property damage all around him and alarms blaring throughout the building. Cronin travelled to

the Northwest Entry Corridor and back to the Senate Wing Door, where he smoked a cigarette inside the building. When he re-entered with his brother, they traveled even further into the Capitol to the Crypt, the Memorial Door, Statuary Hall, and to a connector hallway leading to the House Chamber. When he re-entered the Capitol building for a third time, he traveled to the Crypt again where he was turned back by police officers and exited. After Cronin finally departed, he remained on the restricted grounds of the Capitol until dark.

Therefore, the nature and circumstances of the offense support the recommended sentence of 60 days' incarceration.

### B.    Cronin's History and Characteristics

As set forth in the Draft PSI (ECF No. 57), Cronin is a high school graduate who served in the U.S. Army from August 2014 to August 2018. Draft PSI ¶¶ 42, 45. Cronin then served in the Washington Army National Guard from 2018 to 2021, where he earned the rank of E4 and worked as a Signal Communications Specialist. Draft PSI ¶ 45. He received an honorable discharge. *Id.* Although Cronin plainly deserves the country's thanks for his honorable military service, that service should have sensitized him to the grave risk of harm the January 6 riot posed to the police officers who were guarding the Capitol and the lawful occupants of that building.

Between February 2020 and July 2021, Cronin was employed as a pizza delivery driver in Puyallup. Draft PSI ¶ 44. Cronin was terminated from his employment due to publicity about the instant offense. *Id.* Cronin is unemployed at the time of sentencing. Draft PSI ¶ 43.

During his debrief, Cronin did not take the opportunity to express remorse for his criminal conduct to FBI agents. However, the government gives significant weight to the defendant's early acceptance of responsibility and proffers that Cronin accepted the government's plea offer at the earliest opportunity.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by Cronin. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. And it is important to convey to future potential rioters—especially those who intend to improperly influence the

24

democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The Government's recommended sentence should also discourage Cronin from engaging in such activity in the future. Unlike some other January 6 defendants, Cronin has accepted responsibility for his actions and did so at the earliest opportunity. However, Cronin's actions on January 6 exceeded those of many other rioters who entered and demonstrated inside the building. Near the Lower West Terrace, Cronin encountered real and serious violence between rioters and police officers. Cronin was directly in front of deployments of tear gas and pepper spray. A flashbang detonated directly behind him. Cronin was not deterred by any of what he saw and pressed forward to enter the Capitol building. During the first entry, Cronin travelled into the building towards the Senate, returned to the Senate Wing Door foyer and smoked a cigarette while inside. During his second entry, Cronin travelled even further into the building to the Crypt, the Memorial Door, Statuary Hall, and towards the House of Representatives. Finally, during the third entry—which was only discovered during a recent debrief—Cronin revisited the Crypt, where he encountered police officers trying the clear all rioters from the building.  The government credits Cronin's truthfulness during his debrief; however, Cronin did not express remorse or regret for his actions on January 6.

Given Cronin's actions that day both inside and outside the U.S. Capitol building, and his lack of remorse, it is important that he be deterred and supervised. A period of 60 days' incarceration, 36 months of probation, and 60 hours of community service will adequately serve that purpose.

### E.   The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must sentence Cronin based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Cronin has pleaded guilty to Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the

discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the

spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case:

In the case of Cronin's co-defendant, this Court sentenced Cronin Sr. to 18 months' probation, a $1,500 fine, and $500 restitution. ECF No. 66. Additionally, the Court set as a condition of probation that Cronin Sr. perform 100 hours of community service. *Id.* In Cronin Sr.'s case, the government requested for a sentence of 30 days incarceration followed by three years of probation and $500 restitution. In the instant case, the government requests a sentence of 60 days incarceration followed by three years of probation and $500 restitution because Cronin's conduct is distinguishably more egregious than his father's. Cronin entered the Capitol building at the Senate Wing Door within the first minute of the first breach on January 6. Unlike Cronin Sr., who took full responsibility for choosing to go inside, Cronin falsely claimed that he went inside for safety from the munitions being fired outside and because the crowd was pushing people into the

building. Like Cronin Sr., Cronin traveled to the Northwest Entry Corridor, returned to the Senate Wing Door, and smoked a cigarette inside the building. Cronin and Dylan then re-entered the building on a second occasion, travelling to many locations that Cronin Sr. never saw, including the Crypt, the Memorial Door, Statuary Hall, and to a connector hallway leading to the House Chamber. Unlike Cronin Sr., Cronin and Dylan were part of a mob that choked the hallways of the Capitol while Members of Congress were attempting to evacuate. After the Senate Wing Door was once again breached by rioters, Cronin took advantage of the breach and re-entered the building on a third occasion, traveling to the Crypt where he was turned back by police officers. While Cronin has argued that he re-entered twice to find Dylan and reunite his family, as a serving Army National Guardsman, Cronin should have known better and deferred to police officers who were attempting to clear the building of all unauthorized persons.

Consider *United States v. Mark Simon*, Case No. 21-cr-00067 (ABJ), ECF No. 32 (Gov't Sentencing Memorandum). Simon, like Cronin, chose to ignore violence and chaos all around him, and advanced towards the Capitol. Like Simon, Cronin entered the Capitol building after it had been breached by others. As with Simon, Cronin was inside the Capitol for a shorter period of time and he did not travel many places. Unlike Simon, however, Cronin did not brag on social media about his participation in the events of January 6. Simon, like Cronin, pleaded guilty to violating Section 5104(e)(2)(G). This Court sentenced Simon to 35 days' incarceration. *Id*. ECF No. 38.

In *United States v. Russell Peterson*, No. 21-cr-00309 (ABJ), the defendant, like Cronin, entered through the Senate Wing door, though Peterson entered ten minutes after the initial breach. Unlike Peterson, Cronin did not live stream the riot and did not brag on social media about his participation in the events. Peterson lied to agents about his participation in January 6; Cronin was truthful in his debrief. Peterson entered the Capitol once; Cronin entered the Capitol building on

three separate occasions. Like Cronin, Peterson pleaded guilty to violating Section 5104(e)(2)(G).

This Court sentenced Peterson to 30 days' incarceration. *Id.* ECF No. 35.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. [7]

---

[7] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Cronin to 60 days' incarceration, 36 months of probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:      s/ *Will N. Widman*
WILL N. WIDMAN
Trial Attorney, Detailee

---

imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

**CERTIFICATE OF SERVICE**

On this 2nd day of May, 2023, a copy of the foregoing was served upon all parties

listed on the Electronic Case Filing (ECF) System.


By:     s/ *Will N. Widman*
        WILL N. WIDMAN
        Trial Attorney, Detailee